COOK v. HALE & WARD.

(District Court, W. D. Kentucky, at Paducah.   April 18, 1912.)

1. JUDGMENT (§ 199*)—JUDGMENT ON PLEADINGS—JUDGMENT NON OBSTANTE VEREDICTO.

Judgment non obstante veredicto will not be entered on the pleadings under Civ. Code Prac. Ky. § 386, providing that judgment shall be given for the party whom the pleadings may entitle thereto, though there may have been a verdict against him, unless the verdict does not cure the defect in the pleadings.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 367–375; Dec. Dig. § 199.*]

2. FRAUD (§ 9*)—DECEIT—MISREPRESENTATIONS—ACTION—ELEMENTS.

In an action for fraud in the sale of certain timber, the burden is on plaintiff to prove the misrepresentations; that defendant knew they were false, but intended that plaintiff should believe them to be true and act upon them; that neither plaintiff nor those acting for him knew of the falsity of any of the representations so made; that they were material; that plaintiff was ignorant at the time of their falsity and relied on defendant's statements as true; that, but for such reliance, plaintiff would not have entered into the contract at all; and that he was deceived and defrauded to his injury.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 8; Dec. Dig. § 9.*]

3. BOUNDARIES (§ 54*)—LOCATION—STATE LINE—CHANGE.

Lands in Kentucky lying west of the Tennessee river having been surveyed and divided into townships and sections by a survey by the state surveyor under Act Dec. 26, 1820 (2 Morehead & Brown's St. Ky. p. 1042), such survey fixed the lines as between private owners of the soil, which boundaries were not affected by subsequent changes in the boundary line between Kentucky and Tennessee.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 263, 268–277; Dec. Dig. § 54.*]

4. FRAUD (§ 59*)—SALE OF TIMBER—DAMAGES.

In an action for fraudulent representations in the sale of timber on certain land 12 inches and up at the stump, for which plaintiff paid $8,000, the measure of damages was the difference between such sum and the value of the timber 12 inches and up at the stump actually on the land described in the contract.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 60–62, 64; Dec. Dig. § 59.*]

5. FRAUD (§ 34*)—FALSE REPRESENTATIONS—NECESSITY OF TENDER.

Where plaintiff elected to affirm a contract for the purchase of certain timber which he had been induced to make by defendant's fraudulent representations, he was not required to tender a reconveyance of the timber as a condition precedent to his right to recover the difference between the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

consideration and the value of the timber on the land, in an action for fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 29; Dec. Dig. § 34.*]

At Law. Action by A. D. Cook against Hale & Ward. On motion by defendant for judgment non obstante veredicto and for new trial. Overruled.

Wheeler & Hughes, of Paducah, Ky., for plaintiff.

W. J. Webb, of Mayfield, Ky., and W. M. Smith, of Louisville, Ky., for defendants.

EVANS, District Judge. The court is entirely satisfied with the verdict of the jury, especially as the plaintiff at the hearing of the motion for a new trial agreed to, and no doubt will, execute and place in the hands of the clerk a reconveyance to the defendants of all the timber sold to him by the defendants under the terms of the contract described in the petition (none of which has been removed by the plaintiff), which reconveyance is to be delivered to the defendants upon the payment and satisfaction of the judgment herein. Undoubtedly there was either false misrepresentation or palpable mistake of material facts in the transaction between the parties. The resulting injury would have been rectified, had the plaintiff brought his suit in equity, by a rescission of the contract and a restitution of the $8,000. Practically the same just result will be achieved by the satisfaction of the judgment herein and a reconveyance of the timber to the defendants whereby the status quo will be restored, and if, as the defendants insist, the timber is valuable, they will get the full benefit of that fact. With these general preliminary observations we proceed to the consideration of the questions raised on the two motions which have been made by the defendants.

### Motion for Judgment Non Obstante Veredicto.

[1] Section 386 of the Civil Code of Practice provides for this very old motion in this language:

"Judgment shall be given for the party whom the pleadings entitle thereto, though there may have been a verdict against him."

As at the common law, a motion of this character depends upon the pleadings, and in disposing of it no notice can be taken of the evidence or any matter occurring at the trial. A construction of section 386 may be found in many cases. Pfeifer v. Ahrens, 4 Ky. Law Rep. 829; Arnold v. Arnold, 5 Ky. Law Rep. 696; Evans v. Stone, 80 Ky. 78. The old and very general rule stated in these cases may, however, be regarded, in a certain sense, as having been modified by the ruling of the court in Hill v. Ragland, 114 Ky. 209, 218, et seq., 70 S. W. 634, 637, where it was held that such a motion should only prevail in cases where the evidence heard and issues submitted to the jury and their verdict thereon do not cure the defective pleading. The opinion is quite instructive in this connection, but we extract only the part of it which is in this language, viz.:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"The rule as laid down by Chitty, viz., 'When the verdict can be fairly considered as establishing between the parties the very fact which should have been, but is not, precisely averred in the declaration, and especially when it clearly appears that the particular fact was understood by the parties to be the point in issue to be decided by the jury, it would be unnecessary for the ends of justice, and would be more than useless, to remand the case, that it should again be presented for the consideration of the jury,' has been approved and applied in terms by this court in numerous cases."

[2] We have no doubt the petition as amended was perfectly sufficient; but if it could be conceived that the facts were not precisely averred, yet if, as will be obviously shown, the particular facts were clearly understood by the parties to be the points in issue, the verdict cured the defect, and the motion should not prevail. We say this because the court explicitly charged the jury as follows:

"Comprehensively stated, the plaintiff in substance charges: (1) That the defendants, prior to and at the time of making the contract, falsely misrepresented to the plaintiff and to his agents then acting in his behalf the facts pertaining to the location and boundaries of the land on which the timber stood, and the quantity and character of that timber. (2) That the defendants at the time knew the representations so made by them to be false, but nevertheless intended that the plaintiff and those acting for him at the time should believe them to be true and thereby be induced to act upon them. (3) That neither the plaintiff nor those acting for him knew of the falsity of any of the representations so made by the defendants. (4) That the representations so made were upon matters that were material. (5) That plaintiff and his agents were at the time ignorant of the falsity of said representations, and relied upon the statements of the defendants as true. (6) That, but for such reliance upon the truth of said representations made by defendants, plaintiff would not have entered into the contract at all. (7) That he was deceived and defrauded by the defendants in respect to said matters greatly to his injury."

The jury were also told that these charges were explicitly denied and that the issues presented to them was thus raised. That this was an accurate statement of the issues to be tried by the jury is clearly shown by the fact that the defendants took no manner of exception to this part of the charge which submitted all these matters to the jury. Those indicated in the charge constituted every element to be considered in an action for damages for deceit and fraudulent misrepresentation as this is. The authorities are explicit and abundant. Lehigh Zinc, etc., Co. v. Bamford, 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215; Cooper v. Schlesinger, 111 U. S. 148, 4 Sup. Ct. 360, 28 L. Ed. 382; Stewart v. Wyoming Ranch Co., 128 U. S. 383, 9 Sup. Ct. 101, 32 L. Ed. 439; Trimble v. Reid, 97 Ky. 713, 31 S. W. 861; Ball v. Lively, 4 Dana (Ky.) 369; 8 Encyclopedia of Pleading & Practice, pp. 897, 902, 903, 905; 14 Am. & Eng. Encyc. of Law (2d Ed.) 23.

Without further discussion, we conclude: (1) That the plaintiff's petition as amended states a good cause of action; or (2) that if the facts are not all precisely stated, yet that issues covering everything that should have been more fully averred were understood by the defendants to be those raised by the pleadings as charged by the court, and (3) that any possible defect in the pleadings was cured by the verdict. It therefore results that the motion for a judgment notwithstanding the verdict must be overruled. And what was said by the

Circuit Court of Appeals in C. J. Huebel Co. v. Leaper, 188 Fed. at page 772, 110 C. C. A. 475, may throw light on the situation, if indeed it needs any.

## Motion for a New Trial.

The jury alone were to determine the facts. They did so, and their finding (we think properly) was adverse to the defendants. There was little if any objection to the admission of testimony. The parties were given liberal scope in this regard. The court charged the jury with laborious care, and no exception thereto was taken, except as shown at the foot of the charge; the exception actually taken being much expanded by defendants in their motion for a new trial.

[3] It will serve to elucidate the only exception taken by the defendants to recall that by the contract the defendants sold to the plaintiff all the ash timber "12 inches and up at the stump" on lands in Fulton county, Ky., described in the contract as follows, viz.: .

"The southwest quarter of section 34, T. 1, R. 6 West, and being bounded on the north and west and south by the lands of Hale and Ward and on the east by B. H. Hale's land, also northwest quarter of sec. 34, the northeast southeast and southwest of section 33 and the fractional sections south of sec. 32, 33, and 34 all in T. 1, R. 6 W. containing about twelve hundred acres more or less, except 1¼ acres heretofore conveyed as right of way to C. M. & O. R. R. Co."

This, as plainly appears from reading the contract, is the only description given of the lands. That the exact lines of these sections and fractional sections had not been definitely ascertained by accurate surveys was not the fault of the court, who, since the first trial at the last term, had urged upon counsel the wisdom, if not the necessity, for such ascertainment.

But whether the exception actually taken to the charge would or would not be available elsewhere the court, on this motion, would not hesitate in its discretion to grant a new trial if convinced it had erred whether or not a ruling had been excepted to. Hence we proceed to consider the matter somewhat broadly.

We all know that in all compilations of the laws of Kentucky up to a recent period those respecting the lands west of the Tennessee river were placed in a separate article, and we all understand the reason for this. While in a general way at and before Virginia gave her consent to the creation of the new state, she claimed that her boundaries extended to the Mississippi river, the Chickasaw Indians had such claims to that portion of her territory which lies west of the Tennessee that neither Virginia, previous to the admission of Kentucky in 1792, nor Kentucky thereafter, exercised much sovereign power or right over that territory before 1818. However, Virginia had at an early day granted to many of her officers and soldiers considerable parts of the land in that territory. By the seventh article of the compact between the two states these military grants were protected. By section 1 of an act approved December 22, 1818, it was provided:

"That no entry or survey should be made upon any portion of the land lying within the late Chickasaw Indian boundary for the extinguishment of whose title a treaty has been lately negotiated by Isaac Shelby and Andrew Jackson,

commissioners appointed by the United States." 2 Morehead & Brown, Stats. p. 1040.

Since that treaty the territory west of the Tennessee river has been popularly called "The Purchase," or "Jackson's Purchase."

We know, too, that none of the lands in Kentucky east of the Tennessee river were ever sectionized in the correct and businesslike fashion of the states north and west of us, with the result that it took over 50 years of judicial effort to reduce the titles of land in our state to order.

An act entitled "An act for laying off the lands west of the Tennessee river into townships and sections" was approved February 14, 1820. Its first section is in this language:

"That there shall be appointed by a joint vote of both houses of the General Assembly, some fit person as superintendent in surveying the lands situate west of the Tennessee river in this state." 2 Morehead & Brown, Stats. p. 1040.

William T. Henderson was appointed by the Legislature as superintendent or surveyor for the state of this work, as distinguished from the surveyor of the lands which had been set apart for the various officers and soldiers of Virginia.

It will probably serve a useful purpose to insert section 1 of the Act of December 26, 1820, which, as appears from 2 Morehead & Brown's Statutes, p. 1042, is as follows:

"That the surveyor of the lands set apart for the satisfaction of the legal bounties of the officers and soldiers of the Virginia line on state establishment, be, and he is hereby authorized and required by himself or his deputies, to procure chain carriers and markers, and to survey without delay, all entries made in his office, prior to the first day of May, one thousand seven hundred and ninety-two, on warrants for military services aforesaid; and shall make out a full and fair connection of the surveys so made, showing where and how they interfere with the townships and sections of the land as laid off by William T. Henderson, surveyor for the State, and record one copy in his office, and return another copy to the register's office, on or before the first day of December next; and there shall be, and is hereby allowed to said surveyor as a compensation for the employment of chain carriers and markers, a fee at the rate of six cents for each one hundred poles of the boundary of such running for each chain carrier and marker."

In an act to further regulate the sale of lands west of the Tennessee river, approved January 16, 1827 (Acts 1826–27, c. 38) all persons were forbidden to enter any quarter section or fractional quarter section of land within said district. Very similar language was used in the fourth section of an act approved January 8, 1829 (Acts 1828–29, c. 46), entitled "An act to reduce the price of vacant lands west of the Tennessee river." And we can trace somewhat similar phraseology down to a very recent period. Much the same language is used in the contract in suit.

On December 19, 1820 (Acts 1820, c. 120), there was approved "An act to authorize the printing and publishing a map of the lands west of the Tennessee river," which was in this language:

"Sec. 1. Be it enacted by the General Assembly of the commonwealth of Kentucky, that William T. Henderson be, and he is hereby authorized to print and publish, at his own expense and costs, and for his own benefit, the map

and survey of the land west of the Tennessee river, to which he may add any notes of explanation which to him shall be deemed necessary.

"Sec. 2. Be it further enacted, that the said Henderson shall have the exclusive right, so far as this commonwealth have the power to grant it, of publishing and vending the maps by him so made and printed, for the term of ten years."

Doubtless it was upon this map that the lines of the sections and townships appear, and doubtless the southern line shown thereon would be the "Henderson line," spoken of in the testimony, which showed that no land south thereof in Kentucky had ever been sectionized.

In its opinion in Ray v. Barker's Heirs, 1 B. Mon. (Ky.) at pages 367 and 368, the Court of Appeals, after speaking of the provisions of the compact between Virginia and Tennessee, which was intended to protect the grants to officers and soldiers, said:

"The Legislature of Kentucky, as the means of restricting them to the boundaries of their entries, by the act of 1820, has given specific directions to the surveyor as to the manner of executing the surveys, the bearing and distance of each corner, from the nearest corner of a township or section, as surveyed by Henderson, the state surveyor, and has required him to embrace in the survey the quantity of land only embraced in the entry."

In 1820, with the approval of Congress, the states of Tennessee and Kentucky entered into an agreement by which the line between them was run by Alexander and Munsell, and it was supposed the matter was settled. Later there was a revival of the disputes. This resulted in another survey in 1858–59, and the report of this last survey is the one read in evidence at the trial. Always the line between the Tennessee and Mississippi rivers was supposed to be 36 degrees 30 minutes north latitude, but just where it actually ran on the land itself appears to have been difficult to ascertain and locate. And so we found at the trial that there was one line called the Painted line, another, probably nearly the same, called the Tyler Rock line, another shown by an actual survey recently made located the state line according to the Tennessee Code, and another survey recently made located the state line by the courses indicated by the Kentucky copy of the report of the survey in 1858–59. An error or discrepancy of five degrees between the Tennessee Code copy and the Kentucky copy of the report of 1859 caused the difference between the two last surveys between Puckett's Rock to the east and the Brushy Pond Rock on the west, both of which could be located. Both of the two last-named lines were north of the Tyler Rock and the Painted lines, the one ran according to the Tennessee Code being 794 feet north of the Tyler Rock and Painted lines, and that ran according to the Kentucky copy of the 1859 report being about 2,084 feet north of the Tyler Rock line. It is altogether probable that the "Henderson line," so called, was practically the same as that shown on the Kentucky copy of the report of 1859, which ran, as we have seen, about 2,084 feet north of the Tyler Rock line. The definite and accurate ascertainment of the boundary line between the two states was necessary only for the purpose of settling where the sovereign jurisdiction of the two states respectively ended. It had nothing to do with the settlement of the lines of the lands of private owners of the soil, and in no manner affected

such ownership upon one side or the other of the boundary line of the states. Any citizen might have owned or acquired land upon either side or upon both sides of that boundary. It must be obvious that ascertaining at this late day or in 1859 that the state line was some distance south of the lands sectionized in 1819 did not and could not result in the automatic elongation or enlargement of the sections and fractional sections as surveyed and fixed by Henderson. The lines of these sections and all fractions thereof remained the same, however much the state by treaty or otherwise may have extended its own line southwardly. The land embraced in such extension of territory would remain in the same private ownership, but would not be embraced in any sections previously surveyed and laid off which did not extend to the new state line. This can hardly be controverted. Nor could the owners of lands embraced in the sections and fractions of sections described in the contract in litigation and in previous conveyances on which that description was based, shove back the owners of the lands south of those sections, upon the ground that the two states had agreed upon a new boundary line between themselves. The lines of private owners did not readjust themselves upon new lines made for the states. They had no concern with such new state lines. It was upon plain and, as the court supposed, palpable reasons like these that it charged the jury as it did. The rights of the parties to this suit depended upon what took place between themselves, and in no way upon what took place between the two sovereign states.

[4] In considering the contract and the issues made by the pleadings as to whether the defendants knowingly and fraudulently misrepresented the facts, testimony as to all the surrounding circumstances, including testimony as to what was supposed to be the various lines, was heard without objection, and the jury were told to consider it all. But the court pointed out that the importance of that testimony had relation mainly to these issues because none was really made as to what was the actual and true state line. But when it came to stating the measure of damages in the event the jury should find for the plaintiff, then it seemed entirely clear to the court that it should say that the measure was the difference between the $8,000 paid for the timber, and the value of the ash timber 12 inches and up at the stump actually on the lands described in the contract, which were the sections and fractional sections therein specifically named. They were the only lands, and that was the only timber to which the contract related in any possible way. It would have been palpable error for the court to say anything else upon that particular phase of the case. Yet this was all that was really excepted to by the defendants.

The court pointed out that the uncontradicted testimony showed that no part of the land in Fulton county (which is in the extreme southwest end of the state and was wholly or for the most part taken from what was originally Hickman county) had ever been sectionized south of what was called the Henderson line. We have shown that Henderson's work was done in 1819, before the states undertook to settle the state line. If the land south of the Henderson line was never sectionized, it could not be within the sections described in the

contract, and if not covered by the contract could not be considered in estimating the damages. Nothing could be plainer than this.

If, we repeat, the timber on the land covered by the contract has any value (as defendants insist), they will get the benefit of it, if they accept the reconveyance. If it is of no value, as the jury concluded, then the $8,000 verdict was proper. The court was convinced by the evidence that most of the timber referred to in the testimony was located south of the land embraced in the sections and fractional sections named in the contract, and consequently that it did not and could not pass by the terms of that instrument.

[5] Some contention was heard at the argument that there was no sufficient allegation of a tender back of the timber or a reconveyance thereof before the action was brought to make the petition good. This contention goes upon the assumption that before suing a tender back of the thing purchased was necessary. We think this is a misapprehension. If the plaintiff had sued in equity for a rescission of the contract upon discovering the fraud, he would, of course, have been required to tender back what he had received, as he could not retain it and also recover what he had paid. But when, as here, he affirms the contract and only seeks to recover the damages resulting from the alleged deceit and false representations, no tender back was necessary, for he had a right to retain the timber and recover the damages resulting from the deceit, namely, the difference between what the timber actually was and what it would have been if the representations had been true. The authorities are very explicit. Gregg v. Woods, 3 Ky. Law Rep. 526; Webb v. Milford Shoe Co., 128 Ky. 311, 312, 108 S. W. 229; 8 Encyclopedia of Pleading & Practice, 895.

The motion for a new trial must also be overruled.